## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| JASON D. CLINE, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. 3:07-CV-0985-N (BH) |
| | § | |
| MICHAEL ASTRUE, Commissioner of | § | |
| the Social Security Administration, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to the provisions of Title 28, United States Code, § 636(b)(1)(B), and Special Order No. 3-251, the District Court referred this case for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff, Jason Cline's, Cross Motion for Summary Judgment* filed on March 10, 2008, *Plaintiff, Jason Cline's, Revised Motion for Summary Judgment* ("Pl. Mot.") with brief in support ("Pl. Br."), filed March 10, 2008, and *Commissioner's Motion for Summary Judgment* ("Def. Mot.") with brief in support ("Def. Br."), filed June 6, 2008. Having reviewed the evidence of the parties in connection with the pleadings, the Court recommends that *Plaintiff, Jason Cline's, Revised Motion for Summary Judgment* be **GRANTED,** the *Commissioner's Motion for Summary Judgment* be **DENIED,** and the case be remanded to the Commissioner for further proceedings.[2]

## I. BACKGROUND[3]

### A. Procedural History

Jason Cline ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social

---

[2] Because Plaintiff's revised motion for summary judgment supersedes and replaces the original motion, the Court should **DENY** Plaintiff's *Cross Motion for Summary Judgment* as **MOOT.**

[3] The background information comes from the transcript of the administrative proceedings, which is designated as "Tr."

Security ("Commissioner") denying his claim for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1382. On or about December 6, 2004,[4] Plaintiff applied for supplemental security income alleging disability beginning February 1, 2004. (Tr. at 93-95.) The Social Security Administration denied Plaintiff's application initially and upon reconsideration. (Tr. at 25, 38.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 41.) Hearings, at which Plaintiff and his former attorney appeared, were held on July 27, 2006, and October 16, 2006. (Tr. at 392-441.) On November 15, 2006, the ALJ issued a written decision finding Plaintiff not disabled. (Tr. at 14-19.) The Appeals Council found no reason to review the ALJ's decision and denied Plaintiff's request for review. (Tr. at 5.) Consequently, the ALJ's decision is the final decision of the Commissioner. (*Id.*) Plaintiff appealed the Commissioner's decision to this Court pursuant to 42 U.S.C. § 405(g) on June 4, 2007.

## B. Factual History

### 1. Age, Education, and Work Experience

Plaintiff was born on May 7, 1978, and has a high school general equivalency degree. (Tr. at 400, 418.) His past relevant work experience included jobs as a house mover and construction worker. (Tr. at 439.)

### 2. Psychological or Psychiatric Evidence[5]

Plaintiff's earliest psychological or psychiatric records show treatment in January 2001 at John Peter Smith Hospital ("the Hospital"). (*See* Tr. at 333-68.) Plaintiff voluntarily presented himself to the Hospital with complaints of sleep deprivation for three days, auditory and visual hallucinations,

---

[4] Plaintiff neither dated nor signed the application, but it contains a typewritten date of December 6, 2004, at the top of each of its three pages. (*See* Tr. at 93-95.) The Administrative Law Judge identified the date of filing as November 30, 2004. (*See* Tr. at 14.)

[5] In view of the issues raised in this action, a recitation of the medical evidence is unnecessary.

racing thoughts, paranoia, memory and concentration difficulties, anxiety, hyperactivity, suicidal thoughts,[6] an inability to handle stress, depression, recent weight loss, and a dislike of being around people. (Tr. at 338, 342, 348-50, 356-57, 360-62.) He reported that he "feels that sometimes he can make things move, and that people can insert thoughts into his head to try to make him do things." (Tr. at 356-57.) He was preliminarily diagnosed with psychosis, schizophrenia paranoid type, depression, and agoraphobia. (Tr. at 366.) He completed psychological inventories which appeared to show a general state of depression and anxiety. (*See* Tr. at 344-46.) Plaintiff's Global Assessment of Functioning ("GAF") score was 50.[7] (Tr. at 353.) A discharge summary showed dated January 31, 2001, showed Plaintiff was positive for auditory and visual hallucinations, paranoia, delusions, and thought withdrawal. (Tr. at 356-57.)

Records from the Texas Department of Criminal Justice ("TDCJ") dated June 7, 2001, reveal that Plaintiff had been treated previously for an unspecified mental illness and referred to "Psych". (Tr. at 155.) They reveal nothing else of Plaintiff's psychological condition. (*See* Tr. at 153-75.)

On January 25, 2005, psychiatrist Gurjeet S. Kalra, M.D., evaluated Plaintiff for depression. (Tr. at 199.) Plaintiff related to Dr. Kalra that he had "felt depressed and sad most of the time" since 1999; "feels tired"; "stays in bed most of the time"; is easily frustrated; "has bad mood swings"; "stays in the house all the time"; and has variable sleep, appetite, concentration, and memory with some good days and some bad days. (*Id.*) Dr. Kalra also noted: "Lately has been having shakes. Lately he has felt helpless. He doesn't care any more. He has been isolating, withdrawing. . . . Patient feels helpless

---

[6] The record contains an undated note apparently written by Plaintiff that reflects his suicidal thoughts. (*See* Tr. at 359.)

[7] "Under the applicable scale, the range 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. The inability to keep a job is an example of a serious impairment." *Baty v. Barnhart*, 512 F. Supp. 2d 881, 886 n.4 (W.D. Tex. 2007).

most of the time. He denies feeling hopeless. He denies having any crying spells. He denies any history of true manic episode." (*Id.*) At the time of the evaluation, Plaintiff had a depressed mood, slightly impaired concentration, and limited insight. (Tr. at 200.) Dr. Kalra noted that Plaintiff reported a history of being very impulsive and sometimes experiencing paranoia. (*Id.*) Dr. Kalra diagnosed Dysthymia and assigned a GAF score of 45-50. (Tr. at 201.)

On March 4, 2005, at the request of the Commissioner, a State Agency Medical Consultant ("SAMC") completed a Mental Residual Functional Capacity Assessment. (Tr. at 204-07.) The SAMC found Plaintiff moderately limited in some respects regarding (1) understanding and memory; (2) sustained concentration and persistence; (3) social interaction with the public and supervisors; and (4) work setting adaptation. (Tr. at 204-05.) Consistent with such limitations, the SAMC assessed Plaintiff's functional capacity as follows: "Claimant can understand, remember & carry out detailed but not complex instructions, make decisions, attend & concentrate for extended periods, interact appropriately with co workers & supervisors & respond appropriately to changes in routine work setting." (Tr. at 206.) In a Psychiatric Review Technique ("PRT") form, the SAMC noted that Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning, concentration, persistence, or pace; and one or two episodes of decompensation, each of extended duration. (Tr. at 218.) The SAMC found that Plaintiff had "[a] medically determinable impairment . . . that does not precisely satisfy" the requirements for an affective disorder under section 12.04 of the Listings, namely dysthymia. (Tr. at 211.) The Consultant's Notes associated with the PRT parallel Dr. Kalra's notes. (*Compare* Tr. at 220 *with* Tr. at 200.)

Between July and December 2005, Plaintiff underwent treatment for mental impairments at

Lakes Regional MHMR Center ("MHMR"). (*See* Tr. at 249-99.)[8] On July 29, 2005, he was diagnosed with major depressive disorder and assigned a GAF score of 45. (Tr. at 254.)

On August 10, 2005, MHMR deemed the depressive disorder inactive and diagnosed Plaintiff with a severe bipolar disorder with psychotic features. (Tr. at 249, 260.) At that time, Plaintiff's symptoms included sadness; anhedonia; lack of motivation; mood swings; increased irritability and anger; lack of patience; mood lability; and problems focusing, concentrating, sleeping, and handling stress. (Tr. at 257.) Plaintiff also reported that he "hears self being called" and "hears voice in the distance." (Tr. at 258, 291.) Some psychiatric symptoms were present at a severe or marked level ( *i.e.*, cooperation, self control, depression, and irritability), whereas others were merely of moderate level (*i.e.*, blunted affect, anger, anxiousness, elevated mood, sadness, and tenseness). (*See* Tr. at 258.) Plaintiff was prescribed medication. (Tr. at 260.)

On September 29, 2005, Plaintiff exhibited no symptom of moderate or higher level of severity. (*See* Tr. at 261.) Plaintiff denied depression, had a reasonably stable overall mood, was sleeping well, and had no vague psychotic symptoms. (*Id.*)

On October 31, 2005, a Qualified Mental Health Professional ("QMHP") at MHMR indicated that Plaintiff had mild symptoms related to depression, *i.e.*, depressed mood, anxiety, emotional with-drawal, and blunted affect, and mild or very mild symptoms related to mania, *i.e.*, mild elevated mood and very mild hostility, excitement, and motor hyperactivity. (Tr. at 271.)

On December 1, 2005, Plaintiff exhibited only one symptom that reached the moderate level of severity – irritability. (*See* Tr. at 287.) At that time, Plaintiff was having "trouble remembering" to take his medication although he believed it helped when he took it consistently. (*Id.*)

---

[8] The administrative file contains duplicate copies of some MHMR records. (*Compare* Tr. at 249-66 *with* Tr. at 278-84, 289-99.) The Court's specific cites will generally reflect only one of the two copies.

On March 31, 2006, Plaintiff again exhibited no symptom of moderate or higher level of severity. (*See* Tr. at 285.) He was sleeping well, his mood was reasonably stable, he exhibited better anger management, and he was only minimally depressed and anxious. (*Id.*)

In May 2006, Kristi L. Compton, Ph.D., a forensic and clinical psychologist, twice examined Plaintiff at the request of Plaintiff's attorney. (Tr. at 302.) Dr. Compton scheduled the second examination for psychological testing because Plaintiff was significantly fatigued at the first examination due to sleep deprivation. (*Id.*) She observed at the outset: "It became obvious during the first evaluation session that Mr. Cline is in denial regarding his mental health condition. He prefers to attribute his dysfunction to medical problems, but . . . he appears to have a serious mental illness that significantly affects his functional abilities." (Tr. at 302-03.)

Plaintiff reported several "symptoms of depression that occur[red] more days than not." (Tr. at 305.) He also reported racing thoughts, starting multiple projects at once, spending too much money, and periods in which he had a significantly reduced need for sleep and stayed up for two to three days at a time. (*Id.*) Reportedly, he had episodes of paranoia and had "really good hearing" in that he could "hear a faint voice off in the distance," even when watching television. (Tr. at 306.)

Dr. Compton also discussed Plaintiff's condition with Plaintiff's friend, Paula Muniz. (*See* Tr. at 305.) She told Dr. Compton that Plaintiff's "symptoms are more severe than he will admit." (*Id.*) She described periods of extended sleep-deprivation (up to a week) when Plaintiff would move all the time, talk too fast, and sometimes have incoherent speech. (*Id.*) Following such periods, Plaintiff would "crash" and stay in bed for up to a week without grooming. (*Id.*)

Dr. Compton noted that Plaintiff had "significant obsessive/compulsive features to his personality". (Tr. at 306.) She found that Plaintiff "appears to have classic symptoms of Bipolar I Disorder, Intermittent Explosive Disorder, and Obsessive-Compulsive Disorder." (*Id.*) With respect to

Plaintiff's occupational functioning, she specifically noted that Plaintiff had difficulty keeping jobs because he would get irritated and become "oppositional with his supervisor", or depression would cause him to become lethargic and inactive. (Tr. at 307.) With respect to Plaintiff's activities of daily living, she noted impaired abilities to complete tasks and drive a vehicle. (*Id.*) She concluded that Plaintiff's "social, occupational, and personal functioning appeared to be markedly impaired" due to his distractability, irritability, and depression. (Tr. at 307, 309.) She supported her conclusion with results from a Minnesota Multiphasic Inventory 2 ("MMPI-2") which showed seven[9] elevated clinical scales. (Tr. at 308-09.)

Dr. Compton completed a Medical Assessment of Ability to do Work-Related Activities (Mental) wherein she rated Plaintiff's ability to do work-related activities on a day-to-day basis in a regular work setting. (Tr. at 312-14.) Plaintiff received the two lowest ratings, *i.e.*, 3 or 4,[10] in eighteen of the twenty categories. (Tr. at 312-13.) In nine categories, Plaintiff had completely lost the ability to perform the activity in regular, competitive employment, and in the others, he had substantially lost such ability. (*Id.*) Several negative symptoms contributed to Dr. Compton's assessment – anhedonia, sleep disturbance, low energy, chronic disturbance of mood, psychomotor agitation and retardation, pressured speech, and chronic depression. (Tr. at 314.)

Dr. Compton diagnosed Plaintiff with "Bipolar I Disorder, severe, most recent episode depressed, with mild psychotic features (paranoia and auditory hallucinations)"; "Intermittent Explosive

---

[9] Dr. Compton specifically stated that "six" scales were elevated but discussed seven elevated scales, including one which was only slightly elevated. (*See* Tr. at 308-09.)

[10] The ratings could range from 1 to 4, with a 1 representing "[n]o significant loss or ability" and a 4 representing a complete loss of ability. (Tr. at 312.) A rating of "3"specifically indicates "[s]ubstantial loss of ability to perform the named activity in <u>regular, competitive employment</u> and, at best, could do so only in a sheltered work setting where special considerations and attention are provided." (*Id.*) A rating of "4" indicates "Complete loss of ability to perform the named activity in <u>regular, competitive employment</u> and in a sheltered work setting; could do so only to meet basic needs at home. This is no 'useful' ability to perform this activity in a competitive setting." (*Id.*)

Disorder"; and "Obsessive-Compulsive Disorder." (Tr. at 310.) She found a GAF score of 45 warranted because of Plaintiff's "continuous impairment in occupational and interpersonal functioning." (*Id.*) She concluded that it appeared that Plaintiff met the criteria for listing 12.04. (*Id.*)

Notably, Dr. Compton recognized prior psychiatric or psychological evaluations by MHMR, the SAMC, and Dr. Kalra. (Tr. at 303.) She specifically recognized that her findings are "not congruent with [the SAMC's] report", but specifically stated that "collateral and psychological testing reveals an individual with significant limitations that are directly attributable to mental illness." (*Id.*) Although she noted Dr. Kalra's diagnosis, the symptoms leading to that diagnosis, and the GAF score of 45 given at that time, she neither specifically accepted nor rejected the findings by Dr. Kalra other than to note the congruency between the GAF score given by Dr. Kalra and MHMR. (*Id.*) Additionally, while she did not specifically accept or adopt findings contained in MHMR records, she noted that records dated July 29 to September 29, 2005, showed a recent diagnosis of "Bipolar Disorder, Severe with Psychotic Features" and a GAF score "of 45, which indicates serious impairment in occupational and social functioning." (*Id.*) She further commented that although the September 29, 2005 records indicated that prescribed medications were working, both Plaintiff and Ms. Muniz "reported that he terminated medications because they had an iatronic effect and created severe depression." (*Id.*) Ms. Muniz also informed Dr. Compton that Plaintiff "would sleep all day when taking psychotropic medications, suggesting that his medication regime was not effective." (*Id.*) Dr. Compton found that Plaintiff "simply quit taking the medications rather than discussing the issue with his doctor" and that such action was "[i]n line with his personality." (*Id.*)

### 4. Hearing Testimony

A hearing was held before the ALJ on July 27, 2006. (Tr. at 392.) Plaintiff appeared in person and through his attorney. (*Id.*) Due to an incomplete medical record, the ALJ scheduled a

supplemental hearing.  (Tr. at 432.)  On October 16, 2006, Plaintiff, his attorney, a vocational expert, and a medical expert appeared at the supplemental hearing.  (Tr. at 433.)

### a.  Plaintiff's Testimony

Plaintiff testified at the initial hearing about his bipolar disorder.  (*See* Tr. at 401-10, 416.)  He testified that he did not handle stress well, had extreme mood swings, had a temper, had difficulties getting along with coworkers and people in general, had problems concentrating, was very anxious, was very compulsive, stressed over little things, had difficulties staying on task, and heard voices when he was really stressed.  (*Id.*)  He spent his days sitting on the porch, trying to fix things, or picking up cans.  (Tr. at 410.)  He visited friends only once every six months or so.  (*Id.*)  He described irregular sleep habits in that he might stay up for a couple of days or sleep for three days depending on his mood.  (Tr. at 411.)

### b.  Medical Expert Testimony

As the Commissioner's medical expert ("ME"), Dr. Antoinette Cicerello-McGarrahan testified that Plaintiff had a bipolar disorder that was first noted on August 10, 2005.  (Tr. at 437.)  She testified that Plaintiff had mild restrictions of activities of daily living and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace.  (*Id.*)  Her review of the record revealed no episodes of decompensation since the alleged onset date.  (*Id.*)  Based on her review of Plaintiff's mental impairments, she would restrict him to "no complex or detailed job instructions, no contact with the public", and only "incidental or superficial contact with coworkers."  (*Id.*)  She found Exhibits 6F (psychiatric consultative examination by Dr. Kalra), 12F and 13F (MHMR records), 14F (psychological examination by Dr. Compton), and 15F (records from John Peter Smith Hospital) most persuasive, and recognized Exhibit 1F (TDCJ records) as "important as well."  (Tr. at 437-38.)

### c. *Vocational Expert Testimony*

Tammie Donaldson, a vocational expert ("VE"), also testified at the supplemental hearing. (Tr. at 439-40.) The VE testified that a hypothetical person of the same age and education as Plaintiff who had the limitations found by Dr. Cicerello-McGarrahan would be able to perform Plaintiff's past relevant work as a house mover. (Tr. at 439.) She also testified that such hypothetical person could perform three types of jobs at the medium exertional level that exist in significant number in the national economy: (1) hand packager (105,000 national positions and 6,100 positions in Texas); (2) laundry worker (45,000 national positions with 3,300 in Texas); and (3) kitchen helper (90,000 national positions with 5,800 in Texas). (Tr. at 439-40.) If the hypothetical person "was unable to sustain simple tasks on a consistent basis, able to relate to supervisors on a consistent basis", the person would be unable to do any job. (Tr. at 440.) The VE specifically stated that her testimony was consistent with the Dictionary of Occupational Titles. (*Id.*)

## C. <u>ALJ's Findings</u>

The ALJ denied Plaintiff's application for benefits by written opinion issued on November 15, 2006. (Tr. at 14-19.) The ALJ noted that Plaintiff was not entitled to supplemental security income benefits prior to the date of his application, November 30, 2004. (Tr. at 14.) He found that Plaintiff had not engaged in substantial gainful activity at any time relevant to his decision. (Tr. at 16.) He next found that Plaintiff's bipolar disorder constituted a severe impairment, but that his hepatitis C and arthritis were less than severe. (*Id.*) Supported by the testimony of Dr. Cicerello-McGarrahan, he found that Plaintiff had no impairment or combination of impairments that satisfied the criteria of any impairment listed in the social security regulations. (*Id.* at 16-17.)

In determining Plaintiff's mental RFC, the ALJ recognized Plaintiff's bipolar disorder but concluded that he retained the mental RFC to "understand, remember and follow simple instructions

and complete repetitive tasks." (Tr. at 17.) The ALJ found that the bipolar disorder limited Plaintiff in the following respects: "avoid complex tasks; non-public work; occasional contact with co-workers." (*Id.*) He found Dr. Compton's psychological evaluation inconsistent with MHMR records, and gave her opinion little weight while finding the opinion of Dr. Cicerello-McGarrahan consistent with the PRT dated March 4, 2005,[11] and giving it greater weight. (Tr. at 18-19.)

The ALJ considered Plaintiff's mental RFC and testimony from the VE to conclude that he retained the ability to perform his past relevant work as house mover, and could make a vocational adjustment to jobs existing in significant numbers in the national economy. (Tr. at 19.)

## II. ANALYSIS

### A. <u>Legal Standards</u>

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of

---

[11] The ALJ's opinion specifically references Exhibit 19F. Because the record does not contain an Exhibit 19F, it appears that the ALJ meant to reference Exhibit 9F, the PRT completed on March 4, 2005.

credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*. at 436 & n.1.

**2. Disability Determination**

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony*, 954 F.2d at 292.

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a

finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.  Issues for Review**

Plaintiff presents the following issues for review:

(1)    the ALJ improperly determined that Plaintiff's mental impairment did not meet the Requirements of a Listing Impairment;

(2)    the ALJ improperly weighed the opinion of Plaintiff's examining physician;

(3)    the ALJ improperly determined Plaintiff's mental residual functional capacity; and

(4)    the ALJ erred in finding that Plaintiff can perform his past relevant work.

(Pl. Br. at 1.)

**C. Issue Two: Weighing Physicians' Opinions**[12]

Plaintiff argues that the ALJ improperly discounted the opinion of her examining physician, Dr. Compton, in favor of the testifying medical expert, Dr. Cicerello-McGarrahan, and that substantial evidence does not support Dr. Cicerello-McGarrahan's testimony. (Pl. Br. at 12-14.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent medical opinions. 20 C.F.R. § 416.927(c)(2). Every medical opinion is evaluated regardless of its source. *Id.* § 416.927(d). Unless controlling weight is given to a treating source's opinion under § 416.927(d)(2), the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 416.927(d)(1)-(6). Under the first factor, the Commissioner generally gives "more weight" to opinions rendered by an examining physician than to opinions by a non-examining physician. *Id.* § 416.927(d)(1). Nevertheless, the "ALJ may properly rely on a non-examining physician's assessment when . . . those findings are based upon a careful evaluation of the medical evidence and do not contradict those of the examining physician." *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *accord Carrier v. Sullivan*, 944 F.2d 243, 246 (5th Cir. 1991). When multiple physicians have examined a claimant, the ALJ may properly rely on a non-examining physician's assessment that is supported by medical findings by one of the examining physicians. *Johnson v. Apfel*, 234 F.3d 705, No. 00-10193, 2000 WL 1598004, at *1 (5th Cir. Sept. 27, 2000) (per curiam) (Table,

---

[12] Because resolution of the second issue impacts Issue 1, the Court first considers Issue 2.

Text in Westlaw).

In this instance, the ALJ did not give controlling weight to the opinion of any treating source. (*See* Tr. at 16-19.) He instead relied exclusively on testimony from Dr. Cicerello-McGarrahan to support his finding that Plaintiff's mental impairment does not satisfy any medical listing. (Tr. at 17.) With respect to his determination of Plaintiff's mental RFC, the ALJ relied on records from MHMR, Drs. Kalra and Cicerello-McGarrahan, and a SAMC. (Tr. at 17-18.) The ALJ gave the opinion of Dr. Compton "little weight" because he found it inconsistent with treating records of MHMR. (Tr. at 18.) Finding the opinion of Dr. Cicerello-McGarrahan consistent with the PRT dated March 4, 2005, the ALJ gave "greater weight" to that opinion. (Tr. at 18-19.)

Factors 2 and 5 have no bearing on the respective weight given to the opinions of Drs. Cicerello-McGarrahan and Compton because they are both non-treating specialists. *See* 20 C.F.R. § 416.927(d)(2) and (5). Although Factor 1 clearly supports giving greater weight to the opinion of Dr. Compton because she examined Plaintiff, whereas Dr. Cicerello-McGarrahan rendered a non-examining opinion, Factors 3, 4, and 6 may provide a sufficient basis for according greater weight to an opinion from a non-examining source in some circumstances. While the findings of Dr. Cicerello-McGarrahan in this case contradict those of Dr. Compton, Plaintiff was also examined by the SAMC and Dr. Kalra. Dr. Cicerello-McGarrahan's opinion is specifically consistent with the opinion of the SAMC, and is not clearly contradicted by the opinion of Dr. Kalra or the records of MHMR.[13] Under

---

[13] Plaintiff argues that Dr. Compton's report is consistent with the MHMR treatment records in that they both recorded similar reported symptoms and assigned Plaintiff a GAF score of 45. The records indeed appear consistent to that extent. Additionally, MHMR records also show Plaintiff to have severe or marked psychiatric symptoms on August 10, 2005, with respect to cooperation, self control, depression, and irritability, and moderate symptoms with respect to blunted affect, anger, anxiousness, elevated mood, sadness, and tenseness. (*See* Tr. at 258.) The MHMR records further show the presence of auditory hallucinations and ideas of hopelessness. (Tr. at 258-59.) Nevertheless, Dr. Compton's opinions regarding Plaintiff's ability to maintain employment due to his bipolar condition appear inconsistent with other aspects of the MHMR records – most notably, Clinical Record Forms dated September 29, 2005, December 1, 2005, and March 31, 2006, which show no symptom that exceeds the moderate level of severity. (Tr. at 261, 285, 287.)

these facts, the ALJ did not improperly rely on the testimony from a non-examining source.

Furthermore, substantial evidence supports the testimony. The examination by the SAMC is adequate to support Dr. Cicerello-McGarrahan's conclusion especially when, as here, neither the opinion of Dr. Kalra nor the records of MHMR definitively contradict the opinion of Dr. Cicerello-McGarrahan or the SAMC. The Court does not engage in re-weighing the evidence. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). There is credible evidentiary support for Dr. Cicerello-McGarrahan's opinion, and Issue 2 provides no basis to reverse or remand the decision of the Commissioner.

**D. Issue One: Listed Impairment**

Plaintiff also argues that the ALJ improperly determined that Plaintiff's mental impairment did not meet the requirements of a listed impairment. (*See* Pl. Br. at 6-12.) In particular, he argues that his mental impairment satisfies listing 12.04. (*See id.* at 6-8.)

According to the Social Security regulations, if a claimant is not working, has a severe impairment, and meets the duration requirement, it must then be determined whether the claimant suffers from one of the "listed" impairments or an impairment equal to one of the listed impairments. 20 C.F.R. § 416.920. If it is determined that the claimant suffers from a listed impairment or one equal thereto, the inquiry ends and the claimant is entitled to benefits. *Id.* § 416.920(d). The claimant has the burden of proving that his impairment or combination of impairments meets or equals the listings. *Id.*; *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). To meet a listed impairment, the claimant's medical findings, *i.e.*, symptoms, signs and laboratory findings, must match those described in the listing for that impairment. 20 C.F.R. §§ 416.925(d), 416.928; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). To equal a listing, the claimant's medical finding must be "at least equal in severity and duration to the listed findings." 20 C.F.R. § 416.926(a). Determinations of equivalence must be based

on medical evidence only and must be supported by medically acceptable clinical and laboratory diagnostic techniques. *Id.* § 416.926(b).

Contrary to the ALJ's finding that Plaintiff had no impairment or combination of impairments that met a listed impairment, Plaintiff argues that his mental impairment meets 20 C.F.R. Pt. 404, Appendix 1, Subpt. P § 12.04(A) and (B). Listing 12.04 requires:

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied . . . .

A. Medically documented persistence, either continuous or intermittent, of one of the following:

    1. Depressive syndrome characterized by at least four of the following:
        a. Anhedonia or pervasive loss of interest in almost all activities; or
        b. Appetite disturbance with change in weight; or
        c. Sleep disturbance; or
        d. Psychomotor agitation or retardation; or
        e. Decreased energy; or
        f. Feeling of guilt or worthlessness; or
        g. Difficulty concentrating or thinking; or
        h. Thoughts of suicide; or
        i. Hallucinations, delusions or paranoid thinking; or

    2. Manic syndrome characterized by at least three of the following;
        a. Hyperactivity; or
        b. Pressure of speech; or
        c. Flight of ideas; or
        d. Inflated self-esteem; or
        e. Decreased need for sleep; or
        f. Easy distractability; or
        g. Involvement in activities that have high probability of painful consequences which are not recognized; or
        h. Hallucinations, delusions or paranoid thinking; or

    3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes

(and currently characterized by either or both syndromes);

AND

B.  Resulting in at least two of the following:

>    1.  Marked restriction of activities of daily living; or
>    2.  Marked difficulties in maintaining social functioning; or
>    3.  Marked difficulties in maintaining concentration, persistence, or pace; or
>    4.  Repeated episodes of decompensation, each of extended duration.

Plaintiff contends that the psychiatric evaluation by Dr. Kalra, medical records from MHMR, and psychological evaluation by Dr. Compton support the conditions described in this listing. (Pl. Br. at 8-12.) He contends that Dr. Kalra's January 25, 2005 psychiatric evaluation and Dr. Compton's 2006 psychological evaluation show that he meets the requirements of listing 12.04(A) in that they show depressive and manic syndromes characterized by more than the required number of indicators. (*Id.* at 11-12.) According to Plaintiff, those evaluations support finding satisfaction of criteria (A)(1)(a), (c), (e), (f), (g), and (i); (A)(2)(a), (c), and (e) through (h); and (B)(1) through (3). (*Id.*)

Dr. Kalra's evaluation does not specifically discuss or definitively show satisfaction of the requirements set forth in Listing 12.04(B). On the other hand, Dr. Compton's evaluation appears to support Plaintiff's position with respect to the ALJ's Step 3 determination. However, as found in the prior section, the ALJ permissibly rejected the opinion of Dr. Compton in favor of the opinion of Dr. Cicerello-McGarrahan. The ALJ permissibly relied on testimony from Dr. Cicerello-McGarrahan to find that Plaintiff's mental impairment does not meet the requirements of listing 12.04. Based on the opinion of Dr. Cicerello-McGarrahan, Plaintiff's mental impairment does not satisfy listing 12.04. Consequently, Issue 1 provides no basis to reverse or remand the decision of the Commissioner.

## E.  Issue Three:  Mental Residual Functional Capacity

Plaintiff argues that the ALJ erred in determining his mental RFC because he gave more weight

to the opinion of Dr. Cicerello-McGarrahan than to Dr. Compton. (Pl. Br. at 16.)

"The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). When assessing a claimant's physical and mental abilities, the ALJ first assesses the nature and extent of the claimant's physical and mental limitations and then determines the RFC. 20 C.F.R. § 416.945(b) and (c). A determination of RFC is "based on all of the relevant medical and other evidence" in the record. *Id.* § 416.945(a)(3). "The claimant's RFC assessment is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record." *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005). The relevant policy interpretation states in pertinent part:

> 1. Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

> 2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. . . ..

*Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The RFC is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1379, 1386-87 (5th Cir. 1988).

Determining the mental RFC of a claimant involves consideration and analysis of the evidence and "draw[ing] meaningful inferences and allow[ing] reasonable conclusions about the individual's strengths and weaknesses." *Titles II and XVI: Residual Functional Capacity for Mental Impairments*,

SSR 85-16 (PPS-120), 1985 WL 56855, at *2 (S.S.A. Nov. 30, 1984). When mental impairments are at issue, the ALJ must assess the claimant's mental RFC after the sequential evaluative process passes Step 3. *See* 20 C.F.R. § 416.920a(d)(3).

In this case, the ALJ found that despite his bipolar disorder, Plaintiff retained the mental RFC to "understand, remember and follow simple instructions and complete repetitive tasks." (Tr. at 17.) The ALJ further found that the bipolar disorder limited Plaintiff with respect to complex tasks, public work, and contact with co-workers. (*Id.*) As already discussed, the ALJ permissibly gave greater weight to the non-examining opinion of Dr. Cicerello-McGarrahan than to Dr. Compton's psychological evaluation because the opinion of Dr. Cicerello-McGarrahan is consistent with the opinion of an examining physician (the SAMC) and is not clearly contradicted by the opinion of Dr. Kalra or the records of MHMR. Issue 3 provides no basis to reverse or remand the decision of the Commissioner.

## F. **Issue Four:  Ability to Perform Past Relevant Work**

Plaintiff lastly argues that the ALJ erred in finding that he could perform his past relevant work as a house mover. (Pl. Br. at 16.) He contends that the ALJ failed to determine whether he could hold the job for a significant period of time, as required by *Leidler v. Sullivan*, 885 F.2d 291 (5th Cir. 1989) and *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). (*Id.* at 16-17.)

It is the claimant's burden at Step 4 to establish that he cannot perform his past relevant work. *See Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). Nevertheless, Social Security Ruling  82-62 requires that when the ALJ has determined that a claimant retains the RFC to perform a past relevant job, the decision must contain:  (1) a finding of fact as to the individual's RFC; (2) a finding of fact as to the physical and mental demands of the past job or occupation; and (3) a finding of fact that the individual's RFC would permit a return to his or her past job or occupation. *Titles II and XVI:  A Disability Claimant's Capacity to Do past Relevant Work, in General*, SSR 82-62 (PPS-80), 1982 WL

31386, at *4 (S.S.A. Nov. 30, 1981).  When determining whether or not a claimant retains the RFC to perform past relevant work, the ALJ can look to either (1) the job duties peculiar to an individual job as the claimant actually performed it or (2) the functional demands and job duties of the occupation as generally required by employees throughout the national economy.  *Titles II and XVI:  Past Relevant Work--the Particular Job or the Occupation as Generally Performed*, SSR 82-61 (PPS-72), 1982 WL 31387, at *1-2 (S.S.A. Nov. 30, 1981).

Additionally, in cases of severe mental illness, the Fifth Circuit has specifically held that the Commissioner "must determine whether the claimant can *hold* whatever job he finds for a significant period of time."  *Leidler v. Sullivan*, 885 F.2d 291, 293 (5th Cir. 1989); *accord Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986).  This does not mean, however, "that the ALJ must in every case articulate separate and distinct findings that the applicant can perform the incidents of a job *and* that he can maintain the job over a sustained period."  *Frank v. Barnhart*, 326 F.3d 618, 621 (5th Cir. 2003) (per curiam).  An RFC determination itself encompasses the necessary finding unless "the claimant's . . . ailment waxes and wanes in its manifestation of disabling symptoms."  *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005) (quoting *Frank*).  Typically, the ALJ is not required to make a specific finding that a claimant can maintain employment, unless there is "evidence that [the] claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC."  *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (per curiam).  Mere evidence of "good days and bad days" does not of itself establish an impairment sufficient to require an explicit finding on maintaining employment.  *See Perez*, 415 F.3d at 465.

In this case, after hearing testimony from the VE, the ALJ found Plaintiff not disabled because

Plaintiff retained the necessary RFC to perform his prior job as a house mover, as well as to make a successful adjustment to other work that exists in significant numbers in the national economy. (Tr. at 19.) In his decision, the ALJ cited 20 C.F.R. § 416.945 and SSR 96-8p, both of which make clear that RFC measures an individual's capacity to perform work "on a regular and continuing basis." (Tr. at 16.) As was the case in *Dunbar*, these circumstances dispense with the requirement for a specific finding regarding maintaining employment except for the two situations noted therein. The ALJ specifically recognized that Plaintiff's RFC represented "his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments." (Tr. at 15.) Consequently, the issue is whether the evidence before the ALJ required him to make a specific finding regarding Plaintiff's ability to maintain employment.

Plaintiff specifically related to Dr. Kalra that he had good and bad days with respect to his mental condition. (Tr. at 199.) After listening to reports from Plaintiff and his friend (Ms. Muniz) and conducting a psychological evaluation, Dr. Compton specifically noted that Plaintiff had been unable to sustain full time employment due to intermittent periods of depression or periods when Plaintiff would become irritated or "oppositional with his supervisor" to an extent that he would be fired from the position. (Tr. at 307.)

While evidence of bad and good days does not of itself establish an impairment sufficient to require an explicit finding on maintaining employment, *see Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005), the evidence in this case was not so limited. By its very nature, Plaintiff's bipolar disorder fluctuates between manic and depressive states with periods of apparent stability. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* at 386 (Text Revision 4th ed. 2000) (recognizing that persons with a bipolar disorder experience mood shifts from high to low and back again in varying degrees of severity). Under these circumstances, the ALJ was required by

*Singletary* to specifically determine whether Plaintiff can hold whatever job he finds for a significant period of time. Because Plaintiff's mental "ailment waxe[d] and wane[d] in its manifestation of disabling symptoms", the ALJ's RFC determination itself does not encompass the necessary finding. *See Perez*, 415 F.3d at 465. In such cases, the ALJ's finding that the claimant retains the RFC to perform a job done in the past "is not the type of finding contemplated in *Singletary*." *Moore v. Sullivan*, 895 F.2d 1065, 1069 (5th Cir. 1990). By failing to make the specific determination required by *Singletary* the ALJ committed legal error. *Id.* at 1069-70; *Leidler v. Sullivan*, 885 F.2d 291, 294 (5th Cir. 1989).

Generally, appeals from administrative agencies of a procedural error will not lead to a vacated judgment "unless the substantial rights of a party have been affected." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (per curiam) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam)). However, a failure to apply the *Singletary* standard is a legal error, not a procedural error. The Fifth Circuit has left the lower courts no discretion to determine whether such an error was harmless. Rather, the court mandated that when the Commissioner "has relied on erroneous legal standards in assessing the evidence, he must reconsider that denial." *Moore*, 895 F.2d at 1070 (quoting *Leidler*, 885 F.2d at 294).

In light of the ALJ's legal error, this case should be remanded with directions to the ALJ to apply the correct legal standard as set forth in *Singletary*.[14]

### III.  RECOMMENDATION

For the foregoing reasons, the Court recommends that *Plaintiff, Jason Cline's, Revised Motion*

---

[14]  As an additional argument with respect to Issue 4, Plaintiff argues that the testimony from the VE cannot constitute substantial evidence to support the Step 4 finding because the VE failed to explain why her testimony conflicted with the Dictionary of Occupational Titles as required by SSR 00-4p. (Pl. Br. at 17-18.)  Because circuit precedent mandates remand for legal error, the Court does not consider this argument.

*for Summary Judgment* be **GRANTED,** the *Commissioner's Motion for Summary Judgment* be

**DENIED**, and the decision of the Commissioner be **REVERSED** and the case be **REMANDED** for

reconsideration.

      **SO RECOMMENDED**, on this **29th** day of July, 2008.


                             IRMA CARRILLO RAMIREZ
                             UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

      Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985)*; Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).


                             IRMA CARRILLO RAMIREZ
                             UNITED STATES MAGISTRATE JUDGE